USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 27, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                         :

UNITED STATES OF AMERICA         :

                                       :           16 Cr. 576 (KBF)

  - v. -                             :

                                       :           OPINION & ORDER

MICHAEL MAZZARA, CHARLES KERRIGAN,   :
a/k/a "Duke", ANTHONY MASCUZZIO and   :
CHRISTOPHER KERRIGAN,            :

                                       :

                        Defendants.   :
--------------------------------------------------------------------X

KATHERINE B. FORREST, United States District Judge:

On July 26, 2016, Michael Mazzara ("Mazzara"), Charles Kerrigan (a/k/a "Duke"), and Anthony Mascuzzio ("Mascuzzio") were arrested pursuant to a sealed complaint charging them with one count of conspiracy to commit bank burglary and two counts of bank burglary. (Mem. of Law of the U.S. in Opp'n to the Defs.' Pretrial Mots. ("Govt. Mem.") at 2, ECF No. 130.) At that time, Mascuzzio was on federal supervised release after having pled guilty to transporting stolen property across state lines. (Id. at 2, 18.) Mazzara, Charles Kerrigan, and Mascuzzio were indicted on August 25, 2016; that indictment was twice superseded. The operative indictment charges each defendant, along with a fourth, Christopher Kerrigan (collectively, "defendants"), with conspiracy to commit bank burglary, bank burglary, and bank theft.[1] (See generally Sealed Superseding Indictment ("S2 Indictment"), ECF No. 65.)

---

[1] All four defendants are charged with participating in the conspiracy charged in Count One, as well as Counts Four (Bank Burglary) and Five (Bank Theft) concerning the alleged burglary of a Maspeth Federal Savings Bank branch in Queens, New York in May 2016. All but Christopher Kerrigan are

Pending before the Court are a series of pretrial motions, two of which seek suppression of evidence (Mazzara and Mascuzzio have each brought their own independent suppression motion), and others seeking routine pretrial disclosures. (See generally ECF Nos. 115, 120, 122, 124, 125, 129, 140, 141, 142, and 143). Because none of the motions require resolution of a disputed issue of fact, the Court has not held an evidentiary hearing. All defendants purport to join in all motions.

Mazzara's principle contention is that a nineteen to twenty-one-month period of warrantless, uninterrupted video surveillance from a camera mounted on a utility pole across the street from his residence violated his reasonable expectation of privacy under the Fourth Amendment. (See generally Mem. of Law ("Mazzara Mem."), ECF No. 118.) He seeks to suppress all video footage and investigative fruits related thereto. Mazzara's motion presents a difficult, non-frivolous question of if and when extended video surveillance of public conduct impinges upon the personal and societal values protected by the Fourth Amendment. The Court concludes that the Fourth Amendment does not prohibit extended video surveillance of the type at issue here. Additionally, the Court concludes that the officers conducting the surveillance were acting in good faith, and therefore the motion to suppress should also be denied on that basis.

Mascuzzio separately seeks to suppress evidence recovered from a search of his residence at the time of his arrest that was conducted jointly by the U.S. Probation Department and other federal agents. (See generally Mem. of Law in

charged in Counts Two (Bank Burglary) and Three (Bank Theft) concerning the alleged burglary of an HSBC Bank branch in Brooklyn, New York in April 2016.

Support of Anthony Mascuzzio's Pretrial Mots. ("Mascuzzio Mem."), ECF No. 123.)

It is clear to the Court that a condition of Mascuzzio's supervised release provided

for such searches by the U.S. Probation Department. Neither this motion, nor

Mascuzzio's remaining applications for pretrial disclosures present any difficult

legal issues.

For these reasons and the others set forth below, the Court DENIES each of

the pending pretrial motions.

I. BACKGROUND

A. The Pole Camera Surveillance

The following facts are taken from the parties' submissions concerning the

pretrial motions at issue here, and are undisputed unless otherwise noted.

On or about November 6, 2014, the Federal Bureau of Investigation ("FBI")

and New York City Police Department ("NYPD") (collectively, the "police") installed

a video camera on a utility pole (the "Pole Camera") across the street from the

shared residence of defendants Mazzara and Charles Kerrigan at 1849 West 10th

Street in Brooklyn, New York. (Mazzara Mem. at 2; Govt. Mem. at 4.) The Pole

Camera, which was mounted approximately 12 feet above the ground, "captured

views of the street and sidewalk in front of 1845 and 1849 West 10th Street" as well

as "the driveway to the left" (the "Driveway") (collectively, the "Surveilled Area").

(Govt. Mem. at 4.)

The Pole Camera recorded the Surveilled Area continuously[2] for approximately twenty-one months, from on or about November 6, 2014 until August 6, 2016 (the "Surveillance Period"). (Mazzara Mem. at 2; Govt. Mem. at 5.) All together, the Pole Camera collected somewhere between eighteen to nineteen months of footage.[3] (Mazzara Mem. at 2; Govt. Mem. at 11.) Initially, the Camera's view of the Surveilled Area was "largely unobstructed." (Govt. Mem. at 5.) However, on May 18, 2016, a wooden fence was erected that partially obstructed the view of the Driveway and the front of 1845 West 10th Street. (Id.)

During the Surveillance Period, the Pole Camera captured footage that, according to the Government, depicts "all four defendants making preparations for and disposing of proceeds of two bank burglaries." (Govt. Mem. at 5.) According to Mazzara, the Pole Camera also captured footage of "all the monumental and mundane experiences and details of [his] personal life," including his "outdoor interactions with his new born child, his girlfriend, his ex-girlfriend, his friends, his family, and his acquaintances." (Mazzara Mem. at 2-3.) The police installed the Pole Camera without a warrant and did not obtain a warrant at any point during the Surveillance Period. (Mazzara Mem. at 3.)

---

[2] The Government asserts that the Pole Camera recorded "24 hours per day, seven days a week, with the exception of brief periods when the Pole Camera did not transmit any footage." (Govt. Mem. at 5.) Those "brief periods" are irrelevant to the Court's decision herein.

[3] It is undisputed that the Pole Camera was in place for approximately twenty-one months, from on or about November 6, 2014 until August 6, 2016. While it is unclear precisely how much footage was ultimately recorded by the Pole Camera, it does not alter the Court's Fourth Amendment analysis.

B. <u>The Search of Mascuzzio's Residence</u>

On November 4, 2011, Mascuzzio pled guilty to an indictment charging him

with conspiracy to distribute narcotics and conspiracy to transport stolen property

across state lines. (Govt. Mem. at 18.) As a result, Mascuzzio was sentenced to

fifty-seven months of incarceration and three years of supervised release. (<u>Id.</u>) One

of the conditions of Mascuzzio's supervised release stated:

> [Mascuzzio] shall submit his person, residence, place of business, vehicle, or
> any other premises under his control to a search on the basis that the
> probation officer has reasonable belief that contraband or evidence of a
> violation of the conditions of the release may be found. The search must be
> conducted at a reasonable time and in a reasonable manner. Failure to
> submit to a search may be grounds for revocation. [Mascuzzio] shall inform
> any other residents that the premises may be subject to search pursuant to
> this condition.

(<u>Id.</u>; Mascuzzio Mem. at 4-5.) Mascuzzio was released from custody on or about

March 12, 2015, and his period of supervised release began the same day. (Govt.

Mem. at 18.)

On July 22, 2016, Magistrate Judge Netburn signed a sealed complaint

charging Mascuzzio, Mazzara, and Charles Kerrigan with one count of conspiracy to

commit bank burglary and two counts of bank burglary. (Govt. Mem. at 18-19;

Mascuzzio Mem. at 4.) Subsequently, the Government obtained warrants to

conduct searches at, <u>inter alia</u>, the homes of Mazzara and Charles Kerrigan.

(Mascuzzio Mem. at 4.) The Government did not obtain a warrant to search

Mascuzzio's home at 192 Bay 25th Street in Brooklyn, New York. Nonetheless, a

joint team of federal agents and officers from the U.S. Probation Department

executed a search at that address on July 26, 2016, and removed numerous items

from the residence.  (Govt. Mem. at 19; Mascuzzio Mem. at 4.)  Mascuzzio was taken

into custody the same day.  (Govt. Mem. at 19.)

II.    LEGAL PRINCIPLES—SUPPRESSION MOTIONS

Mazzara's suppression motion is principally directed at the duration of the

Pole Camera surveillance.  He argues that the duration of the surveillance

transforms what might otherwise be lawful surveillance of public conduct into an

unlawful search into the intimacies of his private life.  The motion thus directly

presents the question of whether long-term video surveillance runs afoul of the

Fourth Amendment.  This is not an easy question, and the answer is not found

directly in precedential case law.  This Court therefore looks to the key underlying

principles applicable to answering this question.

A.  Supreme Court Jurisprudence Relevant to Surveillance

The Fourth Amendment protects the "right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV; Kentucky v. King, 563 U.S. 452, 459 (2011).[4]  Over the past

forty years, the scope of protection conferred by the Fourth Amendment has evolved

greatly, from its narrow roots in concepts of property and trespass, to a more

expansive person-based protection, and eventually back again.  What follows is a

brief review of the Supreme Court's shifting jurisprudence.

---

[4] "Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances." United States v. Chadwick, 433 U.S. 1, 9 (1977) (citation omitted); see also United States v. Bailey, 743 F.3d 322, 331 (2d Cir. 2014) ("[T]he ultimate measure of the constitutionality of a government search or seizure is reasonableness.") (internal quotations and citation omitted).  In most instances, the touchstone of a constitutional search is one conducted pursuant to a judicially authorized warrant resulting from probable cause. See Chambers v. Maroney, 399 U.S. 42, 51 (1970).

In 1967, the Supreme Court explicitly moved away from a property-based Fourth Amendment jurisprudence in <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967). There, the Court held that the interception of a telephone conversation by an electronic listening device placed on the exterior of a closed telephone booth violated a person's reasonable expectation of privacy. Although the interception did not involve a trespass (that is, a physical penetration of the telephone booth), the Court rejected the premise that property interests alone control the right of the Government to engage in warrantless search and seizure. <u>Id.</u> at 351-53. Instead, the Court concluded that the "Fourth Amendment protects <u>people</u>, not places." <u>Id.</u> at 351 (emphasis added). Accordingly, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." <u>Id.</u> at 351-52 (citations omitted).

In 1983 and 1984, the Supreme Court expanded upon this person-based concept of Fourth Amendment protection in a pair of cases regarding the warrantless monitoring of electronic surveillance devices. First, in <u>United States v. Knotts</u>, 460 U.S. 276, 285 (1983), the Court held that police monitoring of an electronic "beeper" placed into a container of chloroform sold to the respondent did not invade any legitimate expectation of privacy, and thus was neither a "search" nor a "seizure" under the Fourth Amendment. Although the police could have located the respondent's remote drug laboratory by visually following his public movements, the Court held that "[n]othing in the Fourth Amendment prohibit[s]

the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." <u>Id.</u> at 282. "Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now."[5] <u>Id.</u> at 284.

One year later, the Supreme Court addressed two questions left open by <u>Knotts</u>: (1) whether placement of a beeper by the original owner of the container, but without the knowledge of the buyer, constituted a search or seizure; and (2) whether monitoring the beeper falls within the scope of the Fourth Amendment when it reveals information that could not have been obtained through visual surveillance. <u>See</u> <u>United States v. Karo</u>, 468 U.S. 705, 707 (1984). The Court concluded that installation of the beeper did not infringe any Fourth Amendment interest, but monitoring the beeper signal inside a residence did. <u>Id.</u> at 713-14. In so holding, the Court reiterated the longstanding principle that private residences are places in which individuals reasonably expect privacy free from governmental intrusion, and that those same principles are applicable in situations where the government "surreptitiously employs an electronic device to obtain information that it could not have obtained by observation from outside the curtilage of the house."

---

[5] In his briefing, respondent argued that "the result of the holding sought by the government would be that 'twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision.'" <u>Id.</u> at 283 (citation omitted). The Court rejected that argument as premature, holding that "if such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." <u>Id.</u> at 284.

Id. at 715.  Unlike in Knotts, where the beeper provided no information about the interior of the cabin, the beeper in Karo revealed "a critical fact about the interior of the premises that the Government [was] extremely interested in knowing and that it could not have otherwise obtained without a warrant."  Id.  Together, Knotts and Karo stand for the proposition that "a search of a house should be conducted pursuant to a warrant," but that surveillance of public movement, even with the aid of electronic devices, need not be.  Id. at 718.

In 1986, the boundary of acceptable public surveillance was expanded yet again in a case involving intentional aerial flight over an enclosed yard.  See California v. Ciraolo, 476 U.S. 207 (1986).  There, the Supreme Court reaffirmed its approach in Katz, describing the "touchstone of Fourth Amendment analysis" as "whether a person has a 'constitutionally protected reasonable expectation of privacy.'"  Id. at 211 (citing Katz, 389 U.S. at 360).  The Court further described Katz as establishing a "two-part" inquiry: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?"  Id. (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)).

In Ciraolo, the Supreme Court held that the respondent had "[c]learly . . . met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits" by encircling his yard with a 10-foot fence.  Id. But because the police surveillance occurred in a "navigable airspace," the Court concluded that "[a]ny member of the public flying in this airspace who glanced down

could have seen everything that these officers observed," and therefore "respondent's expectation that his garden was protected from such observation [was] unreasonable and is not an expectation that society is prepared to honor." Id. at 213-14.  Even though the surveilled area was within the curtilage of the home, the Court held that "[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." Id. at 213.  The Court also rejected respondent's argument that the investigative purpose of the aerial surveillance rendered it unlawful. Id. at 213-14.

In 1989, the Supreme Court decided another aerial surveillance case, Florida v. Riley, 488 U.S. 445 (1989).  There, the surveillance involved a helicopter twice flying over a targeted property at 400 feet, looking into a greenhouse on respondent's property. Id. at 448.  The Supreme Court relied on Ciraolo in holding that the targeted aerial surveillance did not run afoul of the Fourth Amendment, stating that although respondent "no doubt intended and expected that his greenhouse would not be open to public inspection", "[a]ny member of the public could legally have been flying over [the] property in a helicopter at the altitude of 400 feet and could have observed [the] greenhouse.  The police officer did no more." Id. at 449-51.  Because "no intimate details connected with the use of the home or curtilage were observed . . . there was no violation of the Fourth Amendment." Id. at 452.

In a concurring opinion, Justice Sandra Day O'Connor agreed that observation of the curtilage of a home from a helicopter 400 above ground "did not violate an expectation of privacy 'that society is prepared to recognize as reasonable.'" Id. at 452 (citing Katz, 389 U.S. at 361.)  She noted that the defendant bears the burden of proving that his expectation of privacy is a reasonable one, and therefore that a "search" has occurred within the meaning of the Fourth Amendment.  Id. at 455.  In a dissenting opinion, Justices Brennan, Marshall, and Stevens expressed concern that "[t]he plurality undertakes no inquiry into whether low-level helicopter surveillance by police of activities in an enclosed backyard is consistent with 'aims of a free and open society.'"  Id. at 456-57.

Fast forward to 2012.  In United States v. Jones, 565 U.S. 400 (2012), the Supreme Court held that warrantless placement of a tracking device on a motor vehicle is an unconstitutional search under the Fourth Amendment.  But although the Court was unanimous in outcome, it was sharply divided in reasoning.  The majority, applying pre-Katz, trespass-based principles of Fourth Amendment analysis, concluded that placing a tracking device on a car constitutes a common-law trespass, and that the Fourth Amendment "must provide at a minimum the degree of protection it afforded when it was adopted."[6]  Id. at 412 (emphasis in original).  Writing for the majority, Justice Scalia stated that the principles set forth

---

[6] In Jones, Justice Scalia attempted to reconcile his rationale therein with Katz by describing Katz as merely expanding upon the trespass-based case law that preceded it.  But as Justice Alito points out in his concurring opinion, this interpretation is not well supported by the text of Katz or the subsequent case law.  Indeed, it did appear prior to Jones that "Katz . . . finally did away with the old approach," and that "an actual trespass is neither necessary nor sufficient to establish a constitutional violation."  Id. at 422-23 (emphasis added by J. Alito).  Jones is in fact a sharp departure from the Katz line of Fourth Amendment cases.

in Katz did not replace the "common-law trespassory test", but merely expanded upon it.  Id. at 409.  As a result, "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."  Id. at 411 (emphasis in original).

In a concurring opinion, Justice Alito (joined by Justices Ginsburg, Breyer, and Kagan) stated that the majority's reliance on principles of trespass "strains the language of the Fourth Amendment . . . has little if any support in current Fourth Amendment case law[,] and [] is highly artificial."  Id. at 419.  Justice Alito relied on the Katz "reasonable expectation of privacy" test to conclude that while "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable", "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."  Id. at 430 (internal citation omitted).  Justice Alito took issue with the fact that "for four weeks, law enforcement agents tracked every movement that respondent made in the vehicle he was driving," and held that "the lengthy monitoring that occurred in this case constituted a search under the Fourth Amendment."[7]  Id.

In a separate concurrence, Justice Sotomayor, who joined the majority's trespass-based analysis, agreed with Justice Alito's conclusion that "longer term GPS monitoring in investigations of most offenses impinges on expectations of

---

[7] The majority acknowledged Justice Alito's argument that "'traditional surveillance' of Jones for a 4-week period 'would have required a large team of agents, multiple vehicles, and perhaps aerial assistance,'" but concluded that "our cases suggest that such visual observation is constitutionally permissible."  Id. at 412.

privacy" because "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.[8] Id. at 415 (citation omitted). But Justice Sotomayor noted, as did Justice Alito, that "technological advances that have made possible nontrespassory surveillance techniques . . . affect the Katz test by shaping the evolution of societal privacy expectations." Id. Justice Sotomayor stated that these competing considerations would play a role in her Fourth Amendment analysis if a trespass had not occurred.

Trespass-based principles featured again in the Supreme Court's 2013 decision in Florida v. Jardines, 569 U.S. 1 (2013). In Jardines, the Court held that bringing a drug-sniffing dog onto a front porch without a warrant constituted a trespassory invasion of the curtilage in which a resident had an expectation of privacy, and therefore constituted a "search" under the Fourth Amendment. Id. at 7-8. In so holding, the Supreme Court found that traditional, trespass-based Fourth Amendment principles were easily applied, and that "when it comes to the Fourth Amendment, the home is first among equals." Id. at 6. Writing again for the majority, Justice Scalia reiterated that "the area immediately surrounding and associated with the home—what our cases call curtilage—[is regarded] as part of the home itself for Fourth Amendment purposes." Id. (internal quotation omitted).

---

[8] Even the majority noted, in dicta, that "[i]t may be that achieving the same result through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question." Id. at 412.

B. <u>Second Circuit Jurisprudence Relevant to Surveillance</u>

A number of cases in the Second Circuit also address the scope of permissible surveillance under the Fourth Amendment. A few, highlighted below, are particularly useful to the question posed by Mazzara's motion.

First, in <u>United States v. Lace</u>, 669 F.2d 46 (2d Cir. 1982), the Second Circuit considered whether telescopic observation (by binoculars), into a defendant's yard violated his expectation of privacy. In holding that it did not, the Court relied on the basic principle that "people generally do not have a legitimate expectation of privacy in open and accessible areas that the public is prepared to recognize as reasonable." <u>Id.</u> at 50 (citations omitted). The court concluded that "[a]lthough some of the observations of the outdoor area were made with binoculars or other visual aids, this did not make such observations unlawful." <u>Id.</u> at 51. In a colorful example, the court noted that had the defendant run around his backyard naked, it would have been unreasonable for him to have expected such act to have been private, and that there is no reason why the judiciary should "clothe similarly located drug traffickers in cloaks of invisibility." <u>Id.</u>

In <u>United States v. Hayes</u>, 551 F.3d 138, 143 (2d Cir. 2008), the Second Circuit reaffirmed that the Fourth Amendment applies only to spaces in which an individual has a reasonable expectation of privacy. And in <u>United States v. Gori</u>, 230 F.3d 44, 50 (2d Cir. 2000) (citing <u>Riley</u>, 488 U.S. at 450), the Second Circuit held that "[n]o reasonable expectation of privacy inheres in what is left 'visible to the naked eye.'"

In <u>Gori</u>, the police set up surveillance in the lobby of a building, then followed a delivery person to the door of the apartment.  <u>Id.</u> at 47.  When the defendant opened his apartment door for the delivery person, the officer was able to see five people inside the apartment from his position in the hallway.  <u>Id.</u>  The officer subsequently directed everyone inside the apartment to step into the hallway, at which point the owner of the apartment (who was not the defendant) provided consent to search the apartment, where narcotics were found.  <u>Id.</u> at 47-49.  While acknowledging that "'searches and seizures inside a home without a warrant are presumptively unreasonable'", <u>id.</u> at 51 (citing <u>Payton v. New York</u>, 445 U.S. 573, 588-90 (1980)), the Second Circuit held that rule is "directed primarily at warrantless <u>physical</u> intrusions into the home."  <u>Id.</u> at 51 (citation omitted).  Because the apartment door was opened voluntarily, and therefore the interior of the apartment "was exposed to public view", <u>id.</u> at 52, "there was no expectation of privacy as to what could be seen from the hall."  <u>Id.</u> at 53.  And "[a]bsent a reasonable expectation of privacy . . . the warrant requirement is inapplicable and the legitimacy of the challenged police conduct is tested solely by the Fourth Amendment's requirement that any search or seizure be reasonable."  <u>Id.</u> at 50 (citations omitted).  The Second Circuit then concluded that the officers "acted reasonably at every stage of the 'swiftly developing situation' presented on [the] record."  <u>Id.</u> at 54-55.

The Second Circuit has expanded upon this principle—that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of

Fourth Amendment protection"—in a series of other opinions.  Katz, 389 U.S. at

351.  For instance, in United States v. Holland, 755 F.2d 253, 255-56 (2d Cir. 1985),

the Second Circuit held that a person does not have a reasonable expectation of

privacy in the common areas of a multi-unit building.  Additionally, in United

States v. Simmonds, 641 Fed. Appx. 99, 104 (2d Cir. 2016), the Second Circuit held

that there is no reasonable expectation of privacy in those portions of a hallway that

are accessible to the public.  Further, in United States v. Taborda, 635 F.2d 131,

139 (1980), the Second Circuit held that unaided visual observation of the inside of

defendant's apartment from an apartment across the street did not constitute a

search within the meaning of the Fourth Amendment.  And finally, in United States

v. Fields, 113 F.3d 313, 321-22 (1997), the Second Circuit held that police officers'

observation of defendants through an uncovered first-floor apartment window did

not violate the Fourth Amendment, stating "[g]enerally, the police are free to

observe whatever may be seen from a place where they are entitled to be."  (citing

Riley, 488 U.S. at 449).

    C.  The Exclusionary Rule

    While evidence seized in violation of the Fourth Amendment is subject to

exclusion at trial under Terry v. Ohio, 392 U.S. 1 (1968), exclusion is not automatic.

See Davis v. United States, 564 U.S. 229, 248 (2011); see also Herring v. United

States, 555 U.S. 135, 140 (2009) ("The fact that a Fourth Amendment violation

occurred . . . does not necessarily mean that the exclusionary rule applies.").  At its

core, the exclusionary rule is "a 'judicially created remedy' of [the Supreme Court's]

own making." <u>Davis</u>, 564 U.S. at 238 (quoting <u>United States v. Calandra</u>, 414 U.S. 338, 348 (1974)).  And although the Court once "treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule", <u>Arizona v. Evans</u>, 514 U.S. 1, 13 (1995), the Court has since "abandoned the old, reflexive application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits." <u>Davis</u>, 564 at 238 (quotation and citations omitted).

The purpose of excluding evidence seized in violation of the Fourth Amendment is to ensure judicial integrity and protect courts from being made a party to "lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasion." <u>Terry</u>, 329 U.S. at 13. Exclusion is not, however, a personal constitutional right. <u>Davis</u>, 564 U.S. at 248 (quoting <u>Stone v. Powell</u>, 428 U.S. 465, 486 (1976)).  As the Supreme Court has noted, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." <u>Id.</u> at 236-37 (citing <u>Herring v. United States</u>, 555 U.S. 135, 141 (2009); <u>United States v. Leon</u>, 468 U.S. 897, 909, 921, n.22 (1984); <u>Elkins v. United States</u>, 364 U.S. 206, 217 (1960)).  The rule's operation has thus been limited to "situations in which this purpose is 'thought most efficaciously served.'" <u>Id.</u> at 236 (quoting <u>Calandra</u>, 414 U.S. at 348).  "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" <u>Id.</u> (quoting <u>United States v. Janis</u>, 428 U.S. 433, 454 (1976)).

For exclusion to be appropriate, the deterrence benefits of suppression must outweigh the rule's heavy costs. <u>Davis</u>, 564 U.S. at 240 ("Police practices trigger the

harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" (quoting <u>Herring</u>, 555 U.S. at 144); see also <u>Hudson v. Michigan</u>, 547 U.S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs.'") (quoting <u>Leon</u>, 468 U.S. at 907)).  The Supreme Court has "rejected '[i]ndiscriminate application' of the rule" and has "held it to be applicable only 'where its remedial objectives are thought most efficaciously served.'" <u>Hudson</u>, 547 U.S. at 591 (quoting <u>Leon</u>, 468 U.S. at 909, and <u>Calandra</u>, 414 U.S. at 348).

The Supreme Court has held that evidence should only be suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  <u>Leon</u>, 468 U.S. at 919 (quoting <u>United States v. Peltier</u>, 422 U.S. 531, 542 (1975)).  Accordingly, the Supreme Court has held that the exclusionary rule does not apply when a search is conducted in good-faith, reasonable reliance on: (1) a judicially issued warrant later held to be invalid (See <u>Leon</u>, 468 U.S. at 922); (2) a subsequently invalidated statute (See <u>Illinois v. Krull</u>, 480 U.S. 340, 349-50 (1987)); (3) erroneous information concerning an arrest warrant in a database maintained by judicial employees (See <u>Evans</u>, 514 U.S. at 14); (4) erroneous records maintained by police employees (See <u>Herring</u>, 555 U.S. at 137); and (5) binding judicial precedent (See <u>Davis</u>, 564 U.S. at 239-40).

D.  Search as a Condition of Supervised Release

In <u>United States v. Knights</u>, 534 U.S. 112 (2001), the Supreme Court addressed the constitutionality of a warrantless search conducted subject to a condition of probation.  There, respondent was sentenced to probation for a drug offense, and the probation order included a condition that he would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer."  <u>Id.</u> at 114.  Shortly after respondent was placed on probation, the police developed a "reasonable suspicion" that he had vandalized a power transformer, causing approximately $1.5 million in damage.  <u>Id.</u> at 114-15.  Subject to that reasonable suspicion and respondent's probation order, the police conducted a warrantless search of respondent's apartment, which revealed several items of incriminating evidence.  <u>Id.</u>  During the ensuing criminal trial, respondent moved to suppress the evidence obtained during the warrantless search of his apartment.

Reiterating the longstanding principle that "[t]he touchstone of the Fourth Amendment is reasonableness", the Supreme Court held that "the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment."  <u>Id.</u> at 123.  In doing so, the Court explicitly rejected respondent's argument that the <u>investigatory</u> (as opposed to probationary) purpose of the search caused it to fall outside the scope of the probation order.  <u>Id.</u> at 117-18.  Because the respondent had

a reduced "reasonable expectation of privacy" as a result of the probation order, id. at 119, and because the government has a strong interest in monitoring probationers for potential violations of criminal law, id. at 120-21, the warrantless search was "reasonable" and thus constitutional under the Fourth Amendment.

III.   DISCUSSION—SUPRESSION MOTIONS

A.  <u>The Pole Camera Surveillance</u>

As previously stated, Mazzara's suppression motion raises a number of complex and difficult questions regarding the scope of the Fourth Amendment and what constitutes a "reasonable" expectation of privacy in an increasingly digital age. However, for the reasons stated below, this Court concludes that the warrantless video surveillance at issue here did not violate the Fourth Amendment, and therefore Mazzara's motion is DENIED.  Furthermore, even if this Court were to find that a constitutional violation did occur, the Court concludes that the officers conducting the surveillance acted in good faith, reasonable reliance on binding judicial precedent, and therefore the exclusionary rule does not apply.

i.  <u>Reasonable Expectation of Privacy</u>

Unlike in <u>Jones</u> and <u>Jardines</u>, the surveillance at issue here did not involve any physical trespass.  The Pole Camera was not installed on Mazzara's property, nor did it monitor, provide a view, or record any activities occurring within Mazzara's residence.  Indeed, it is undisputed that the Pole Camera was located in a place "where [the police] are entitled to be," <u>Fields</u>, 113 F.3d at 321 (citing <u>Riley</u>, 488 U.S. at 449), and recorded only what a normal passerby could have seen from

that location.[9]  As a result, this Court must apply the two-part <u>Katz</u> inquiry, asking

(1) whether Mazzara manifested a subjective expectation of privacy, and (2)

whether society is willing to recognize that expectation as reasonable.  <u>See</u> <u>Ciraolo</u>,

476 U.S. at 211.

For purposes of this decision, the Court assumes that Mazzara manifested a

subjective expectation of privacy under <u>Katz</u>.  First, the record demonstrates that

on May 18, 2016, a wooden fence was erected in front of the Driveway and 1845

West 10th Street.  (Govt. Mem. at 5.)  The Court may reasonably assume that the

fence was erected to shield Mazzara's activities from at least street-level views, and

therefore the fence serves as evidence of <u>some</u> subjective expectation of privacy, at

least as of May 18, 2016.[10]  <u>See</u> <u>Ciraolo</u>, 476 U.S. at 211-212.  Second, Mazzara has

specifically challenged the <u>duration</u> of the video surveillance, arguing that he had a

subjective expectation that his public actions within the Surveilled Area would not

be observed and recorded for as long as they were.  (Mazzara Mem. at 12.)  Even if

Mazzara had no subjective expectation that isolated actions within the Surveilled

Area were private, the Court has no reason to disbelieve Mazzara's proffer that he

---

[9] Although the Pole Camera was mounted approximately 12 feet above the ground, (Mazzara Mem. at 2), that does not pose any difficult complications for purposes of this Court's Fourth Amendment analysis.  The Supreme Court has permitted aerial surveillance in <u>Ciraolo</u> and <u>Riley</u>, and the Second Circuit has held that unaided visual observation from an apartment across the street does not constitute a search.  <u>See</u> <u>Taborda</u>, 635 F.2d at 139.  Certainly, if police are permitted to hover above a yard in a helicopter, they must be permitted to mount a camera above eye level.

[10] An argument could be made that Mazzara did not manifest a subjective expectation of privacy in the Surveilled Area prior to May 18, 2016.  Before that date, the Surveilled Area was completely exposed to the public.  It could be the case that, prior to erecting the fence, Mazzara did not subjectively believe his conduct within the Surveilled Area—which any passerby could have observed at any time—would remain private.  However, because the Court assumes that Mazzara had at least a subjective expectation that the aggregate of information collected would remain private, it need not confront this issue directly.

subjectively believed the aggregate of information revealed by his public conduct during the Surveillance Period was private.  Accordingly, the Court must proceed to the second prong of <u>Katz</u>, asking whether society is willing to recognize Mazzara's subjective expectation of privacy as reasonable.

Generally, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  <u>Katz</u>, 389 U.S. at 351 (citations omitted).  Accordingly, courts have routinely held that "people generally do not have a legitimate expectation of privacy in open and accessible areas that the public is prepared to recognize as reasonable", <u>Lace</u>, 669 F.2d at 50 (citations omitted), and "[n]o reasonable expectation of privacy inheres in what is left 'visible to the naked eye.'"  <u>Gori</u>, 230 F.3d at 50 (citing <u>Riley</u>, 488 U.S. at 450).  Here, the Pole Camera observed and recorded only those actions that were "expose[d] to the public."  It did not provide any view into Mazzara's home, and did not track or record his movements through any other private spaces.  Moreover, construction of the fence on May 18, 2016 does not affect the Fourth Amendment analysis here.  As the Supreme Court has held, "the mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."  <u>Ciraolo</u>, 476 U.S. at 213 (citing <u>Knotts</u>, 460 U.S. at 282).  It is undisputed that the Pole Camera was installed in a lawful location, and that the Surveilled Area was "clearly visible" from that location.  As

such, the fence does little more than evidence Mazzara's subjective expectation of privacy as of May 18, 2016.

But that is not the end of the Court's inquiry. If the Pole Camera was only installed for one hour, or one day, or even one week, the Court would have no difficulty concluding that the surveillance did not violate any reasonable expectation of privacy under the Fourth Amendment. But the video surveillance here occurred continuously over the course of approximately twenty-one months. (Mazzara Mem. at 2; Govt. Mem. at 5.) Mazzara's suppression motion raises legitimate questions regarding whether that sort of continuous video surveillance is consistent with the "aims of a free and open society." Riley, 488 U.S. at 456-57. Nonetheless, the Court concludes that there was no Fourth Amendment violation here.

Mazzara's principal argument is that "the aggregate of information garnered by the police from the pole camera surveillance was not something [he] exposed to the public," even though "much . . . of what was captured on video . . . was incrementally visible to a passerby." (Mazzara Mem. at 13.) As a hypothetical, Mazzara argues that while a passerby might observe him meeting with a woman outside his residence on a single day, the surveillance here allowed police to observe him meeting with the same woman numerous times over the course of twenty-one months, thereby "deduc[ing] that they are in a romantic relationship." (Id.) According to Mazzara, that "very private fact is only available to the police by the cumulative view of many separate public and private observations" and "[t]he public

. . . was not in a position to arrive at the same conclusion as to the relationship." (Id. at 13-14.)  But Mazzara's argument is unavailing for at least two reasons.

First, Mazzara is incorrect that the police here were uniquely positioned to collect an "aggregate of information" vis-à-vis the public.  There are numerous people—a neighbor, mail carrier, student, or dog walker, just to name a few—that might be expected to pass by the Surveilled Area every day, perhaps even multiple times per day.  Those members of the public have a routine and continuous opportunity to observe Mazzara's public conduct within the Surveilled Area, and thereby "arrive at the same conclusion[s]" as the police.  Anyone who has ever had a "nosy neighbor" certainly knows that to be true.

Second, there is no controlling case law that suggests the <u>quantum or type</u> of information collected during otherwise lawful surveillance somehow renders that surveillance unconstitutional.  Taking Mazzara's own example, if the Pole Camera had recorded him meeting with the same woman "dozens and dozens" of times during one particularly intense day, week, or month in his life, is the surveillance suddenly therefore unconstitutional?  And at what point would the constitutional line be crossed?  After one week, or two?  After the camera happens to record six meetings with the same person, or perhaps ten?

There is no principled basis upon which this Court can conclude that the <u>duration</u> of otherwise lawful public video surveillance, standing alone, is of constitutional significance.  Such a ruling would have dangerous and largely unknown consequences on law enforcement's ability to collect evidence regarding

certain crimes, particularly those, like the ones charged in this case, that by their nature take place over an extended period of time. The ruling that Mazzara seeks would require law enforcement to make arbitrary decisions regarding when to turn off or disable surveillance cameras that are incrementally recording incriminating evidence. For example, consider a surveillance camera installed outside the known location of a group being investigated as a possible terrorist cell. Every day for a month, the camera records people coming in and out of the building with suspicious materials and new associates. The Fourth Amendment does not and cannot require the police to remove or otherwise disable the camera on day 20 (or 30, or 45, or 60 . . .) merely because it has been recording "too long", especially if there are reasonable law enforcement reasons to leave it in place. Additionally, if a surveillance camera on a street corner records evidence of a drug deal, the dealer does not have a valid suppression claim just because the camera had been installed two, four, six months, a year, or two years prior and had filmed continuously since then, capturing repeated images of the dealer's use of the corner. These are but two simple examples of the worrying and unnecessary confusion that Mazzara's proposed ruling would inject into Fourth Amendment jurisprudence. There are undoubtedly many more.

Nor does it matter that the Pole Camera here was specifically trained on the outside of Mazzara's residence. The Supreme Court has repeatedly held that the investigatory purpose of otherwise lawful observation does not render it unconstitutional. See Ciraolo, 476 U.S. at 213-14 (holding that "it was irrelevant

that the [police] observation from the airplane was directed at identifying the [marijuana] plants and that the officers were trained to recognize marijuana"); see also Bond v. United States, 529 U.S. 334, 338 n.2 (2000) ("the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment").  The relevant inquiry is whether Mazzara had a reasonable expectation that his public conduct would not be recorded for so long, not whether the police subjectively hoped to catch him in the act of committing a crime.

The reality is that society has come to accept a significant level of video surveillance.  Security cameras are routinely installed in public parks, restaurants, stores, government buildings, schools, banks, gas stations, elevators, and all manner of public spaces.  Additionally, security cameras are increasingly being installed on public streets, highways, and utility poles.  On any given day, a person is almost certain to be recorded by at least one security camera, and likely many more.  A routinized person might therefore be picked up on the same camera(s) day after day.  It is simply unreasonable for any person to believe that their public conduct, as it might be and often is recorded by one of those security cameras, nonetheless should remain private from observation.  See Katz, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.") (citations omitted); see also Lace, 669 F.2d at 50 ("[P]eople generally do not have a legitimate expectation of privacy in open and accessible areas that the public is prepared to recognize as reasonable.");

Gori, 230 F.3d at 50 (holding that "[n]o reasonable expectation of privacy inheres in what is left 'visible to the naked eye'") (citing Riley, 488 U.S. at 450).  Mazzara protests that the Pole Camera recorded his "outdoor interactions with his new born child, his girlfriend, his ex-girlfriend, his friends, his family, and his acquaintances." (Mazzara Mem. at 2-3.)  But Mazzara ignores the obvious risk of conducting such activities in public.

Mazzara's suppression motion relies in large part on dicta from two concurring opinions in United States v. Jones, 565 U.S. 400 (2012).  (Mazzara Mem. at 7-9.)  In his Jones concurrence, Justice Alito (joined by Justices Ginsburg, Breyer, and Kagan) concludes that while "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable", "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."  565 U.S. at 430.  Justice Sotomayor explicitly agreed with that conclusion, id. at 416, and even the majority left open the possibility that four weeks of continuous surveillance achieved through electronic means "is an unconstitutional invasion of privacy."  Id. at 412.  Put together, it certainly appears as though a majority of the Court, at least as of 2012, was prepared to hold that four weeks of warrantless GPS tracking violated the Fourth Amendment.

But the implication of Jones is not easily applied to the facts of this case. First, this Court cannot base its decision on what effectively amounts to a guess regarding how the Supreme Court might decide an issue of first impression.  Not

only has the composition of the Supreme Court changed since 2012, so has the nature and ubiquity of technology in our everyday lives. In <u>Jones</u>, Justice Alito wrote (and Justice Sotomayor agreed) that "the same technological advances that have made possible nontrespassory surveillance techniques will also affect the <u>Katz</u> test by shaping the evolution of societal privacy expectations." <u>Id.</u> at 415. Accordingly, it may be that the Supreme Court's opinion regarding "societal privacy expectations" has changed in the intervening years. Additionally, the <u>Jones</u> majority noted that Fourth Amendment jurisprudence based on the nature of the crime and/or the duration of surveillance creates "thorny problems," for instance, is there a constitutional difference between "2-day monitoring of a suspected purveyor of stolen electronics" versus "6-month monitoring of a suspected terrorist?" <u>Id.</u> at 412-13. The Supreme Court may have to address and decide those questions in the future, but it has not done so yet. This Court views the questions as—today— answered in favor of allowing such surveillance rather than drawing arbitrary lines.

Second, the video surveillance at issue here is categorically distinct from the type of warrantless GPS tracking addressed in <u>Jones</u>. Unlike a GPS tracker, which "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations", <u>id.</u> at 415, a stationary video camera only observes and records whatever happens to cross its fixed line of sight. While it is true that the Pole Camera here recorded <u>all</u> of Mazzara's public activities within the Surveilled Area, it did not record <u>any</u> of his activities outside the camera's narrow field of view.

Considering that the "Fourth Amendment protects <u>people</u>, not places", <u>Katz</u>, 389 U.S. at 351 (emphasis added), many of the concerns expressed by the concurring justices in <u>Jones</u>—for instance, that extended GPS monitoring "enables the Government to ascertain, more or less at will, [a person's] political and religious beliefs, sexual habits, and so on"—don't apply with equal force here.

For those reasons, the Court concludes that the video surveillance at issue here did not violate any expectation of privacy that modern society is prepared to recognize as reasonable under <u>Katz</u> and its progeny. Accordingly, the video surveillance did not violate the Fourth Amendment, and Mazzara's suppression motion must be DENIED.

ii. <u>Good Faith Exception to the Exclusionary Rule</u>

Even if this Court were to find that the video surveillance at issue here violated the Fourth Amendment, it would still deny Mazzara's suppression motion. That is because the officers here had no "knowledge", and cannot "properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." <u>Leon</u>, 468 U.S. at 919. Accordingly, the "deterrence benefits of suppression" do not outweigh the heavy costs of the exclusionary rule, and Mazzara's suppression motion must be denied on that basis alone. <u>Davis</u>, 564 U.S. at 240.

The Supreme Court has held that the exclusionary rule does not apply when a search is conducted in good-faith, objectively reasonable reliance on binding judicial precedent. See <u>Davis</u>, 564 U.S. at 239-40; <u>see also</u> <u>United States v. Aguiar</u>,

737 F.3d 251, 259 (2d Cir. 2013). In such circumstances, "police conduct [is not] sufficiently deliberate that exclusion can deter it, and [is not] sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring, 555 U.S. at 141. Here, the relevant precedent at the time of surveillance established that:

- "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz, 389 U.S. at 351.

- Police surveillance of a person's public movements, even with the aid of electronic tracking devices, is permissible under the Fourth Amendment (absent a common-law trespass). See Knotts, 460 U.S. at 285; Karo, 468 U.S. at 707.

- In the context of electronic beepers, "[n]othing in the Fourth Amendment prohibit[s] the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." Knotts, 460 U.S. at 282 (citation omitted).

- Law enforcement officers are permitted to engage in aerial observation of the curtilage of a home, even when the purpose of that observation is investigatory. See Ciraolo, 476 U.S. at 213-14; Riley, 488 U.S. at 449-51.

- "[T]he mere fact that an individual has taken measures to restrict some views of his activities" does not "preclude an officer's observations from a

public vantage point where he has a right to be and which renders the
activities clearly visible." <u>Ciraolo</u>, 476 U.S. at 213.

- "[P]eople generally do not have a legitimate expectation of privacy in open
  and accessible areas that the public is prepared to recognize as
  reasonable", <u>Lace</u>, 669 F.2d at 50 (citations omitted), and "[n]o reasonable
  expectation of privacy inheres in what is left 'visible to the naked eye.'"
  <u>Gori</u>, 230 F.3d at 50 (citing <u>Riley</u>, 488 U.S. at 450).

- "Generally, the police are free to observe whatever may be seen from a
  place where they are entitled to be." <u>Fields</u>, 113 F.3d at 321-22 (citing
  <u>Riley</u>, 488 U.S. at 449).

Based on that and other precedent, the police officers here had every reason
to believe that the video surveillance they engaged in was lawful. As discussed
<u>infra</u>, there is no controlling precedent that holds the duration of otherwise lawful
surveillance is of constitutional significance. If this Court were to hold that twenty-
one months of continuous video surveillance is unlawful, it would be the first to do
so. Even though the dicta from <u>Jones</u> may have raised some red flags, the
concurrences in that case address significantly different facts, and do not serve as
binding precedent.

The officers in this case did not engage in any culpable conduct—they "acted
as a reasonable officer would and should act" under the circumstances. <u>Leon</u>, 468
U.S. at 920. Because the exclusionary rule is not "a strict-liability regime", it
should not and does not apply in this case. The law may someday change, and

"responsible law-enforcement officers will take care to learn 'what is required of them' under Fourth amendment precedent." <u>Davis</u>, 564 U.S. at 241 (quoting <u>Hudson</u>, 547 U.S. at 599). But in this case, the Court concludes that the officers were acting in good faith and objectively reasonable reliance on binding precedent that authorized the video surveillance they engaged in.

Accordingly, Mazzara's motion to suppress is independently and alternatively DENIED on that basis.

B. <u>The Search of Mascuzzio's Residence</u>

Mascuzzio's motion to suppress evidence recovered from the warrantless search of his residence does not raise any difficult legal questions. For the reasons stated below, Mascuzzio's motion is DENIED.

It is undisputed that, as a condition of his supervised release, Mascuzzio was required to "submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of release may be found." (Mascuzzio Mem. at 4-5.) In <u>Knights</u>, the Supreme Court held that a near identical condition, paired with reasonable suspicion of a crime, supported a warrantless search of respondent's apartment under the Fourth Amendment. <u>See</u> 534 U.S. at 123. <u>Knights</u> controls here.

It is undisputed that on July 26, 2016, a team of U.S. Probation Officers and other federal agents searched Mascuzzio's apartment without a warrant. (Mascuzzio Mem. at 4.) And, based on the record, it is clear that the law

enforcement team had the requisite "reasonable suspicion" to conduct the search. Magistrate Judge Netburn signed a sealed complaint against Mascuzzio on July 22, 2016, charging him with one count of conspiracy to commit bank burglary and two counts of bank burglary. (Mascuzzio Mem. at 4.) Probable cause is a more demanding standard than reasonable suspicion, therefore there can be no doubt that element is satisfied here. Furthermore, it makes absolutely no difference that the purpose of the search was investigatory, or that the joint search team included non-probationary officers. As the Supreme Court held in Knights and the Second Circuit reaffirmed in United States v. Lifshitz, 369 F.3d 173, 181 (2004), warrantless searches conducted pursuant to a condition of release, "whether for law enforcement or probationary purposes—are acceptable . . . if based upon reasonable suspicion." Here, the joint search team (1) had reasonable suspicion to conduct the search, and (2) contained officers from the U.S. Probation Department. The presence of other federal agents does not render the otherwise lawful search unconstitutional.

The Court's resolution of Mascuzzio's suppression motion is therefore a straightforward application of existing law. Because Mascuzzio was subject to a condition of release allowing for warrantless searches, and because the officers had reasonable suspicion that their search would reveal evidence of a crime, the search was reasonable under the Fourth Amendment. Accordingly, Mascuzzio's motion to suppress is DENIED.

IV.    DEFENDANTS' DISCOVERY MOTIONS

The defendants have additionally filed a number of pre-trial motions seeking discovery of routine material, including: (1) evidence the Government intends to use at trial; (2) all evidence the Government intends to introduce under Fed. R. Evid. 404(b); (3) all exculpatory and impeachment material under Brady v. Maryland, 373 U.S. 83, 87 (1963); (4) a list of interviewed individuals and corresponding interview notes; (5) notice of the Government's intended expert testimony; (6) a Government witness list; and (7) copies of any agreements made pursuant to United States v. Giglio, 405 U.S. 150 (1972).  (ECF Nos. 120, 122.)  For the reasons stated below, those motions are hereby DENIED as premature.

To the extent defendants are requesting production of Brady and Giglio materials, the Government has represented that it understands its discovery obligations, and that it intends to comply with such obligations.  (Govt. Mem. at 27-29.)  The defendants have not proffered any evidence to suggest that the Government is delinquent in fulfilling its obligations, or that the Government is actively concealing evidence under Brady, Giglio, or any other rule.  Accordingly, defendants have not provided any basis upon which the Court can grant the requested relief, and there is no need to issue an order directing the Government to comply with its discovery obligations at this time.

To the extent defendants are challenging the timing of the Government's discovery (e.g., by requesting certain evidence immediately, or between forty-five to sixty days before trial), the Court notes that the Governments is under no legal

obligation to provide the requested material so early. This Court declines to impose on the Government any additional discovery obligations not already contemplated by the applicable rules, absent some showing of delinquency or bad faith. The defendants have proffered no evidence to suggest that the Government will not comply with its discovery obligations in due course.

V.     CONCLUSION

For the reasons stated above, the Court DENIES each of the pending pretrial motions.

The Clerk of Court is accordingly directed to terminate the motions at ECF Nos. 115, 120, 122, 124, 125, 129, 140, 141, 142, and 143.

SO ORDERED.

Dated:      New York, New York
            October 27, 2017

_____
      KATHERINE B. FORREST
      United States District Judge